UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

MITCHEL SAVICKAS,

                Petitioner,

v.

RANDEE REWERTS,

                Respondent.

_____/

Case No. 1:18-cv-1131

Honorable Janet T. Neff

## **OPINION**

This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Promptly after the filing of a petition for habeas corpus, the Court must undertake a preliminary review of the petition to determine whether "it plainly appears from the face of the petition and any exhibits annexed to it that the petitioner is not entitled to relief in the district court." Rule 4, Rules Governing § 2254 Cases; *see* 28 U.S.C. § 2243. If so, the petition must be summarily dismissed. Rule 4; *see Allen v. Perini*, 424 F.2d 134, 141 (6th Cir. 1970) (district court has the duty to "screen out" petitions that lack merit on their face). A dismissal under Rule 4 includes those petitions which raise legally frivolous claims, as well as those containing factual allegations that are palpably incredible or false. *Carson v. Burke*, 178 F.3d 434, 436-37 (6th Cir. 1999). After undertaking the review required by Rule 4, the Court concludes that the petition must be dismissed because it fails to raise a meritorious federal claim.

## **Discussion**

### I.   Factual Allegations

Petitioner Mitchel Savickas is incarcerated with the Michigan Department of Corrections at the Carson City Correctional Facility (DRF) in Carson City, Michigan.  Following a jury trial in the Kent County Circuit Court, Petitioner was convicted of first-degree murder, Mich. Comp. Laws § 750.316, three counts of armed robbery, Mich. Comp. Laws § 750.529, carrying a concealed weapon (CCW), Mich. Comp. Laws § 750.227, and possession of a firearm during the commission of a felony (felony-firearm), Mich. Comp. Laws § 750.227b.  On August 3, 2016, the court sentenced Petitioner to prison terms of life without parole for the murder conviction, parolable life for each robbery conviction, and 3 to 5 years for CCW conviction, all consecutive to a 2-year sentence on the felony-firearm conviction.

The Michigan Court of Appeals concisely summarized the facts underlying Petitioner's convictions:

> Late in the evening of July 27, 2016, defendant and two others approached the victims—Isiah Blue, Jeremiah Gurel, and Malick Mack—at a bus stop in Grand Rapids, Michigan. Defendant pulled out a gun and told the victims to "empty [their] pockets."  When Blue tried to run away, defendant shot him four times.  Gurel and Mack were uninjured, but Blue died as a result of the gunshot wounds.

*People v. Savickas*, No. 334610, 2017 WL 5616123, at *1 (Mich. Ct. App. Nov. 21, 2017).  The matters raised in the petition, however, do not relate directly to development of the underlying facts at trial.  Instead, the petition is concerned with the circumstances under which Petitioner ended up representing himself at trial.

Those circumstances are described by the court of appeals as follows:

> Defendant's trial was originally to begin on July 5, 2016; however, on that day, defendant told his appointed counsel that he wanted to raise a defense that was "somewhat

2

questionable." The trial court adjourned the trial. Defendant's attorney then filed a motion to withdraw as counsel which stated that she was appointed counsel and that she "must follow all rules of professional conduct and ethics in representing [defendant]." She also wrote that there had been such a breakdown in the relationship between counsel and defendant that she could no longer represent defendant. Counsel also requested that the court appoint successor counsel for defendant. Counsel did not support the motion with a brief or provide other details.

*Savickas*, 2017 WL 5616123, at *1. The "somewhat questionable" defense turned out to be a claim that Petitioner shot Blue in self defense. (Pet., ECF No. 1-1, PageID.20) ("[C]ounsel . . . did not wish to put up a self-defense defense.").

Trial was postponed for a week. On the first day of the rescheduled trial,[1] July 11, 2016, before jury *voir dire*, the trial judge denied counsel's motion to withdraw. Petitioner then, for the first time, indicated that he did not want counsel to continue representing him. The Michigan Court of Appeals explained:

> [D]efendant confirmed for the trial court that he had discussed the charges with his appointed counsel. The trial court attempted to dissuade defendant from representing himself and allowed defendant to consult with counsel several times. The trial court denied counsel's motion to withdraw but [also informed defendant] that [he] had the absolute right to self-representation. Ultimately, the trial [court] permitted defendant to act as his own lawyer with counsel remaining as legal advisor.
>
> Q. [BY THE COURT] All right. . . . [defendant], anything further?
>
> A. [BY DEFENDANT] No, sir.
>
> Q. All right. You ready to proceed with [counsel] as your lawyer?

---

[1] Petitioner's trial spanned four days, July 11 through July 14, 2016. On July 11, the parties selected the jury. On July 12 and 13, the prosecution put on its case through the testimony of seventeen witnesses, including Blue's companions, Jeremiah Gurel and Malik Mack; one of Petitioner's group, Bryshaun Scott; and Petitioner's girlfriend. The prosecution rested about an hour into the second day of testimony. Then Petitioner put on his case. He recalled his girlfriend and asked five questions and then provided his own testimony in narrative form. After Petitioner rested, the parties gave closing arguments, the court instructed the jury, and the jury began deliberations. The jury completed deliberations and rendered its verdict on the morning of July 14. The trial transcripts from *People v. Savickas*, Kent Cty. Cir. Ct. Case No. 02012-FC, will be referenced herein by date.

A. No, sir.

Q. Okay. You want to represent yourself?

A. Yes, sir.

Q. All right. Would you like [counsel] to sit next to you and be your legal

advisor?

A. Yes, sir.

Q. All right. Very good. We'll proceed with picking a jury.

The trial then proceeded with *voir dire* and jury selection with defendant representing himself. Defendant questioned potential jurors about their employment, family, and whether any of their children had ever been in trouble. Defendant asked one juror if she knew anyone who had been "killed, either murdered, or maybe in a war . . . ." Defendant exercised one challenge for cause, which the trial court denied, and he did not exercise any peremptory challenges.

*Savickas*, 2017 WL 5616123, at *1-2. After the jury was selected the court adjourned trial for the

day.

The next day, the trial court again advised Petitioner that his appointed counsel was

ready to proceed on his behalf and inquired whether Petitioner would avail himself of counsel's

assistance. The court of appeals described the colloquy as follows:

The next day, before the jury was sworn in, the trial court reaffirmed defendant's desire to represent himself, stating, "And what I'm going to do now is just reaffirm or give you a chance to reconsider your decision yesterday to represent yourself . . . ." The trial court advised defendant of each charge against him and the possible penalties, and defendant responded each time that he understood. Defendant then gave a speech to the trial court regarding his lack of legal knowledge and ability to represent himself.

The trial court responded to defendant's speech and also informed defendant that it had "a responsibility to run these proceedings orderly, efficiently, and fairly." It also opined that delaying the proceedings would prejudice the prosecution. The prosecutor confirmed that delaying the case for substitute counsel would prejudice him. The prosecutor stated that he had "reluctant witnesses," and they would become more reluctant if the trial were delayed.

The proceedings were then recessed for 28 minutes. After the recess, the trial court and defendant engaged in the following exchange:

Q. [BY THE COURT] Well, [defendant], I'm looking for a direct answer here at this point. I understand how you feel. However, are you going to represent yourself or are you going to have [counsel] represent you?

A. I'm representing myself.

Defense counsel confirmed that she was "prepared to go to trial" and represent defendant.

Defendant then represented himself during the remainder of the trial. Defendant delivered an opening statement, during which he asserted that he would present a self-defense theory. Defendant also cross-examined witnesses, elicited testimony that supported his theory of the case, and called a witness of his own. Defendant consulted with his standby counsel multiple times throughout the trial. Before defendant presented his case, the trial court again encouraged defendant to allow counsel to represent him, stating, "I would encourage you, again, give some thought to whether or not you want [counsel] to represent you. I'm not going to bug you on that, but if at any point you have any concerns or you'd like her to resume representation, please call that to my attention." Defendant testified on his own behalf. He then gave a closing statement, during which he argued that he had proven all of the elements of self-defense.

*Savickas*, 2017 WL 5616123 at *2.

The jury concluded Petitioner's self-defense argument was not convincing. Petitioner testified that he, his brother Daniel, and his friend Bryshaun, had initially planned to "hit some licks"—slang for commit some robberies—to raise some money.[2] Instead, Petitioner decided to sell his .22 caliber assault rifle and a laser sighted Ruger handgun to a friend who lived in the area of 44th Street and Clyde Park Avenue. The three boarded the city bus to travel to the buyer's house.

When he got on the bus, Petitioner noticed Isiah Blue and his two friends. Petitioner and Blue had a history of conflict. Petitioner's instincts told him he was in danger.

---

[2] Petitioner's trial testimony appears in the July 13, 2016 Trial Transcript at pages 52-99.

Blue and his friends exited the bus at the 44th Street stop and walked west on 44th toward a bus stop on the 44th Street bus route. Petitioner, his brother, and his friend followed.

Petitioner noticed one of Blue's friends had his hand in his pocket. Petitioner also noticed they were looking back at Petitioner and his group. Petitioner anticipated that the individual with his hand in his pocket had a gun. So, inexplicably, Petitioner sped up to close the gap. He caught up with Blue's group at the bus stop. He pulled out the assault rifle and directed Blue and his friends to empty their pockets, not to rob them, he claimed, despite his earlier plans to commit robberies, but to reveal their weapon(s). Although Petitioner thought one of Blue's friends, and not Blue, had the gun, Petitioner pointed the gun and directed his attention at Blue.

In response, Blue put his hands up and started to back away. Because Petitioner expected the other guy had the gun, Petitioner claimed that he interpreted Blue's move as an attempt to distract Petitioner. Petitioner also acknowledged that, as Blue backed away, Blue gave Petitioner a look like he was respecting Petitioner. Petitioner told Blue to stop moving; Blue continued to back away. But, then, Blue gave Petitioner a look that made Petitioner believe that Blue thought Petitioner's gun was a fake. Petitioner claims Blue began to drop his hands. So, Petitioner shot him in the chest.

Petitioner testified that he shot Blue in the chest because he did not want to kill Blue, just to warn him. Petitioner claims he could not "visually remember" what happened next. (July 13, 2016 Trial Tr., p. 67.) Petitioner did not deny that Blue turned and ran as Petitioner continued to shoot. Three of Petitioner's following shots found their mark in Blue's back.

Petitioner and his companions then fled. Petitioner testified that, when they got home, his brother asked why Petitioner had shot Blue. Petitioner responded: "Man, he kept looking

at me like the gun was fake." (July 13, 2016 Trial Tr., p. 68). During his testimony, Petitioner was not consistent as to whether he believed Blue had a gun or one of Blue's friends did. But, he never did see a gun. He only thought they might have had a gun, and might have intended to use it on him, because of how they looked at him. Petitioner's self-defense claim was, essentially, that the world is a dangerous place, Blue did not like me, any one of that group might have had a gun, so I shot Blue before he or his friends could shoot me. Petitioner's closing argument was particularly detrimental to his self-defense claim:

> I shouldn't have to change my ways. I shouldn't have to turn around because I'm scared of—because I'm scared of somebody. I shouldn't have to do that. Like I said, I could stand back, sit back, and let them go on their way and let them be ahead of us to stop . . . anything from happening . . . .

(July 13, 2016 Trial Tr., p. 120.) It is certainly understandable why counsel wanted to avoid putting Petitioner on the stand to make those claims.

After Petitioner was sentenced, he, with the assistance of appointed appellate counsel, filed a notice of appeal in the Michigan Court of Appeals. He raised two issues:

I. Trial court erred in permitting defendant to represent himself during trial because his decision was not knowingly, intelligently, and voluntarily made.

II. Trial court abused its discretion in denying defendant's request for substitute counsel.

(Pet., ECF No. 1, PageID.2.) The Michigan Court of Appeals denied relief by opinion issued November 21, 2017.

Petitioner then filed a pro per application for leave to appeal in the Michigan Supreme Court. That court denied leave by order entered May 1, 2018. *People v. Savickas*, 910 N.W.2d 281 (Mich. 2018). On September 26, 2018, Petitioner filed his habeas corpus petition.

The petition raises the first of the two issues Petitioner raised in the state appellate courts. (Pet., ECF No. 1, PageID.4, 10.)

## II.   AEDPA Standard

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (AEDPA). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Williams*, 529 U.S. at 381-82; *Miller v. Straub*, 299 F.3d 570, 578-79 (6th Cir. 2002). Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565 U.S. 34 (2011). Thus, the inquiry is limited to an examination of the legal

landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 135 S. Ct. at 1376 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (internal quotations omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Habeas Rule 4 permits the Court to dismiss the petition "[i]f it plainly appears from the petition and any attached exhibits that the petition is not entitled to relief . . . ." Rule 4, Rules Governing § 2254 Cases. The advisory committee notes to the rule, however, make clear that the Court is not limited to the petition and its exhibits as the Court conducts its preliminary review:

> 28 U.S.C. § 2243 requires that the writ shall be awarded, or an order to show cause issued, "unless it appears from the application that the applicant or person detained is not entitled thereto." Such consideration may properly encompass any exhibits attached to the petition, including, but not limited to, transcripts, sentencing records, and copies of state court opinions. The judge may order any of these items for his consideration if they are not yet included with the petition.

Rule 4, Rules Governing § 2254 Cases, advisory committee's note to 1976 adoption.

The Court's preliminary review of this petition included the Michigan appellate court's docket entries, dispositive opinion, and dispositive order, and the trial court's file, including the transcripts of the trial and sentencing hearing. The Court takes judicial notice of those proceedings in the Kent County Circuit Court, the Michigan Court of Appeals, and the Michigan Supreme Court. *See Rodic v. Thistledown Racing Club, Inc.*, 615 F.2d 736, 738 (6th Cir. 1980) ("'Federal courts may take judicial notice of proceedings in other courts of record.'") (Quoting *Granader v. Public Bank*, 417 F.2d 75, 82-83 (6th Cir. 1969) (citing cases)); *Lyons v. Stovall*, 188 F.3d 327, 332 n.3 (6th Cir. 1999) ("Although Petitioner's briefs which were submitted to the state appellate courts were not included in the Joint Appendix submitted in connection with this appeal, it is well-settled that "[f]ederal courts may take judicial notice of proceedings in other courts of record" and we have done so here by obtaining Petitioner's state appellate briefs from the Michigan appellate courts.").

III.     The Right to Self-Representation

In a Michigan criminal proceeding, Petitioner is entitled to represent himself instead of being represented by counsel.  That right is implicit in the Sixth Amendment to the federal constitutional and it is explicit in the Michigan Constitution of 1963.

### A.     The Federal Constitutional Right to Self-Representation

The Sixth Amendment provides that a criminal defendant shall have the right to the assistance of counsel for his defense.  U.S. Const. amend. VI.  At issue here is a corollary to that right, the right to self-representation.  *Adams v. U.S. ex rel. McCann*, 317 U.S. 269, 279 (1942) ("The right to assistance of counsel and the correlative right to dispense with a lawyer's help are not legal formalisms.").  The clearly established federal law regarding self-representation is expressed in two Supreme Court cases: *Faretta v. California* 422 U.S. 806 (1975) and *Martinez v. Ct. of Appeal of Cal., Fourth App. Dist.*, 528 U.S. 152 (2000).

In *Faretta*, the Court found support for the right of self-representation in the structure of the Sixth Amendment right to the assistance of counsel:

> The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense.  It is the accused, not counsel, who must be 'informed of the nature and cause of the accusation,' who must be 'confronted with the witnesses against him,' and who must be accorded 'compulsory process for obtaining witnesses in his favor.'  Although not stated in the Amendment in so many words, the right to self-representation—to make one's own defense personally—is thus necessarily implied by the structure of the Amendment.  The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails.
>
> The counsel provision supplements this design.  It speaks of the 'assistance' of counsel, and an assistant, however expert, is still an assistant. The language and spirit of the Sixth Amendment contemplate that counsel, like the other defense tools guaranteed by the Amendment, shall be an aid to a willing defendant—not an organ of the State interposed between an unwilling

defendant and his right to defend himself personally. To thrust counsel upon the accused, against his considered wish, thus violates the logic of the Amendment. In such a case, counsel is not an assistant, but a master; and the right to make a defense is stripped of the personal character upon which the Amendment insists. It is true that when a defendant chooses to have a lawyer manage and present his case, law and tradition may allocate to the counsel the power to make binding decisions of trial strategy in many areas . . . . This allocation can only be justified, however, by the defendant's consent, at the outset, to accept counsel as his representative. An unwanted counsel 'represents' the defendant only through a tenuous and unacceptable legal fiction. Unless the accused has acquiesced in such representation, the defense presented is not the defense guaranteed him by the Constitution, for, in a very real sense, it is not his defense.

*Faretta*, 422 U.S. at 819-821 (footnotes and citations omitted). Although the Court recognized a criminal defendant's right to self-representation, it acknowledged that the right was a qualified one. The Constitutional mandate to provide counsel to a criminal defendant is premised upon the fact that "[i]t is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts." *Id.* at 834. Because a criminal defendant representing himself relinquishes that benefit, his waiver must be "'knowingly and intelligently'" made. *Id.* at 835. Moreover, the right to self-representation must yield to "'the dignity of the courtroom.'" *Id.* at 834, n. 46. It is not a license to ignore the rules of procedure or engage in "obstructionist misconduct." *Id.*

In *Martinez*, 528 U.S. 152, the Supreme Court concluded that the right of self-representation did not extend to appeals. In reaching its conclusion, the Supreme Court commented on the scope of the right of self-representation established in *Faretta*, stating:

As the *Faretta* opinion recognized, the right to self-representation is not absolute. The defendant must "'voluntarily and intelligently'" elect to conduct his own defense, and most courts require him to do so in a timely manner. He must first be "made aware of the dangers and disadvantages of self-representation." A trial judge may also terminate self-representation or appoint "standby counsel"—even over the defendant's objection—if

12

necessary. We have further held that standby counsel may participate in the trial proceedings, even without the express consent of the defendant, as long as that participation does not "seriously undermin[e]" the "appearance before the jury" that the defendant is representing himself. Additionally, the trial judge is under no duty to provide personal instruction on courtroom procedure or to perform any legal "chores" for the defendant that counsel would normally carry out. Even at the trial level, therefore, the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer.

*Martinez*, 528 U.S. at 161-162 (footnotes and citations omitted).

## B.    The State Constitutional Right to Self-Representation

In *People v. Williams*, 683 N.W.2d 597, 602 (Mich. 2004), a case relied upon by the Michigan Court of Appeals in deciding Petitioner's appeal, the Michigan Supreme Court distinguished the implicit right to self-representation guaranteed by the Sixth Amendment and the explicit right to self-representation as guaranteed by the Michigan constitution. The *Williams* court looked to the case of *People v. Anderson*, 247 N.W.2d 857 (Mich. 1976) and Michigan Court Rule 6.005 to identify what the state court must do to give effect to the explicit guarantee of the right of self-representation under Michigan law. *Williams*, 683 N.W.2d at 602.

In *Anderson*, the Michigan Supreme Court, drawing from the circumstances that swayed the *Faretta* Court to recognize the right of self-representation, identified certain requirements that must be met before a state court could permit a criminal defendant to represent himself:

First, the request must be unequivocal . . . . Second, once the defendant has unequivocally declared his desire to proceed Pro se the trial court must determine whether defendant is asserting his right knowingly, intelligently and voluntarily. . . . The third and final requirement is that the trial judge determine that the defendant's acting as his own counsel will not disrupt, unduly inconvenience and burden the court and the administration of the court's business.

*Anderson*, 247 N.W.2d at 859-860.  The Michigan Court Rules provide a procedural framework

for ensuring the substantive requirements of *Anderson* are met:

**(D) Appointment or Waiver of a Lawyer.**  If the court determines that the defendant is financially unable to retain a lawyer, it must promptly appoint a lawyer and promptly notify the lawyer of the appointment.  The court may not permit the defendant to make an initial waiver of the right to be represented by a lawyer without first

(1) advising the defendant of the charge, the maximum possible prison sentence for the offense, any mandatory minimum sentence required by law, and the risk involved in self-representation, and

(2) offering the defendant the opportunity to consult with a retained lawyer or, if the defendant is indigent, the opportunity to consult with an appointed lawyer.

**(E) Advice at Subsequent Proceedings**.  If a defendant has waived the assistance of a lawyer, the record of each subsequent proceeding (e.g., preliminary examination, arraignment, proceedings leading to possible revocation of youthful trainee status, hearings, trial, or sentencing) need show only that the court advised the defendant of the continuing right to a lawyer's assistance (at public expense if the defendant is indigent) and that the defendant waived that right.  Before the court begins such proceedings,

(1) the defendant must reaffirm that a lawyer's assistance is not wanted; or

(2) if the defendant requests a lawyer and is financially unable to retain one, the court must appoint one; or

(3) if the defendant wants to retain a lawyer and has the financial ability to do so, the court must allow the defendant a reasonable opportunity to retain one.

The court may refuse to adjourn a proceeding to appoint counsel or allow a defendant to retain counsel if an adjournment would significantly prejudice the prosecution, and the defendant has not been reasonably diligent in seeking counsel.

Mich. Ct. R. 6.005.

The crux of Petitioner's argument is that the trial court failed to comply with the requirements of *Anderson* and Rule 6.005.  (Pet., ECF No. 1-1, PageID.17) ("[T]he trial court did[,] in no way, based on the record here, [satisfy] any requirements of MCR 6.005(D) . . . . [I]f the trial court fails to [substantially] comply with eh requirements in *Anderson* and the Court Rule, then the defendant has not effectively waived his Sixth Amendment right to assistance of counsel.").  Such an argument does not raise a federal constitutional issue.

"[A] federal court may issue the writ to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'" *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (quoting 28 U.S.C. § 2254(a)). A habeas petition must "state facts that point to a 'real possibility of constitutional error.'" *Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977) (quoting Advisory Committee Notes on Rule 4, Rules Governing Habeas Corpus Cases). To the extent that Petitioner claims that the trial court failed to comply with requirements of state law as expressed in *Anderson* or Michigan Court Rule 6.005, his claim is not cognizable on habeas review.

Moreover, it is not the province of a federal habeas court to re-examine state-law determinations on state-law questions. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). The decision of the state courts on a state-law issue is binding on a federal court. *See Wainwright v. Goode*, 464 U.S. 78, 84 (1983). Thus, in Petitioner's case, the Michigan Court of Appeals determination—that the requirements of *Anderson* and Michigan Court Rule 6.005 were satisfied—conclusively resolves that issue.

### C.    Were Petitioner's Eyes Open?

The federal constitutional requirements for a waiver of the right to counsel are less specific than the requirements of *Anderson* or Michigan Court Rule 6.005. The *Faretta* Court required only that the defendant "be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Faretta*, 422 U.S. at 835 (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942)). The Supreme Court has "not . . . prescribed any formula or script to

be read to a defendant who states that he elects to proceed without counsel." *Iowa v. Tovar*, 541 U.S. 77, 88 (2004).[3]

It is not surprising that, in complying with the more specific requirements of *Anderson* and Rule 6.005, the trial court created a record that reveals Petitioner knew what he was doing and, with eyes wide open, proceeded to trial without counsel. Petitioner quotes extensively from his statement to the trial court regarding his concerns in going forward with trial. (Pet., ECF No. 1-1, PageID.19-22.) In Petitioner's colloquy with the trial judge, he identified all the disadvantages that would follow from representing himself at trial. Petitioner does not contend he was unaware of the nature of the charges or the punishments that would follow if he were convicted. The Michigan Court of Appeals found that "[Petitioner] made his decision 'with eyes wide open.'" *Savickas*, 2017 WL 5616123, at *4 (citation omitted). Petitioner has failed to demonstrate that the appellate court's finding was unreasonable. He has also failed to demonstrate that the court of appeals' resolution of his claim was contrary to or an unreasonable application of the clearly established federal law as set forth in *Faretta*.

### D. Involuntary Self-Representation

Though Petitioner pays lip service to the claim that his waiver of the right to counsel was unknowing, the true focus of his argument is that his waiver was involuntary—coerced by the "Hobson's choice"[4] of representation by counsel who did not believe in Petitioner's desired

---

[3] Although the Supreme Court has concluded that a particular script is not required, the Sixth Circuit has adopted a model inquiry to ensure that a waiver of counsel is intelligent and voluntary. *United States v. McDowell*, 814 F.2d 245, 249-50 (6th Cir. 1987) ("[W]e . . . invoke our supervisory powers to identify the nature of the inquiry to be made and the procedure to be followed henceforth . . . . In the future, whenever a federal district judge in this circuit is faced with an accused who wishes to represent himself in criminal proceedings, the model inquiry [from 1 *Bench Book For United States District Judges* 1.02-2 (3d ed. 1986)] or one covering the same substantive points along with an express finding that the accused has made a knowing and voluntary waiver of counsel, shall be made on the record prior to allowing the accused to represent himself.").

[4] Merriam-Webster explains the origin of the phrase "Hobson's choice" as follows:

defense or no representation at all. Petitioner's "Hobson's choice" argument is not novel. The

petitioner in *Pouncy v. Palmer*, 846 F.3d 144 (6th Cir. 2017), raised a similar argument.

Pouncy claimed he was forced to choose between unprepared counsel and

representing himself. Pouncy claimed his counsel was unprepared because he had not developed

the necessary information to pursue an alibi defense. The Michigan Court of Appeals concluded

otherwise:

> [In January, Pouncy's counsel] moved to adjourn trial on the ground that he had not yet been
> able to investigate numerous witnesses allegedly related to [Pouncy's] defense. The trial
> court granted the motion and rescheduled the trial for later that same month. The morning
> of trial, defendant complained that [his counsel] had not prepared an alibi defense. However,
> the records shows that [his counsel] hired an investigator for the specific purpose of tracking
> down and interviewing potential alibi witnesses. The investigator met with [Pouncy] to
> collect the names of potential witnesses. [Pouncy] conceded that he only gave the
> investigator the name and number of one potential witness. The investigation apparently
> revealed no legitimate potential for an alibi defense. Therefore, [counsel] was not ineffective
> for failing to raise a futile defense.

*Pouncy*, 846 F.3d at 155-56 (quoting *People v. Pouncy*, Nos. 269298, 270604, 2008 WL 9869818,

at *4 (Mich. Ct. App. Mar. 25, 2008)). Pouncey's case, therefore, is similar to Petitioner's. Neither

Pouncy nor Petitioner wanted to proceed to trial with an attorney that would not pursue the

accused's preferred defense.

---

In the late 16th and early 17th centuries, Thomas Hobson worked as a licensed carrier of passengers, letters, and parcels between Cambridge and London, England. He kept horses for this purpose and rented them to university students when he wasn't using them. Of course, the students always wanted their favorite mounts, and consequently a few of Hobson's horses became overworked. To correct the situation, Hobson began a strict rotation system, giving each customer the choice of taking the horse nearest the stable door or none at all. This rule became known as Hobson's choice, and soon people were using that term to mean "no choice at all" in all kinds of situations.

https://www.merriam-webster.com/dictionary/Hobson's%20choice (last visited October 11, 2018). The Sixth Circuit has used the term to describe the choice facing a criminal defendant when he must choose between counsel he does not want or no counsel at all. *See, e.g., Pouncy v. Palmer*, 846 F.3d 144 (6th Cir. 2017); *Stokes v. Scutt*, 527 F. App'x 358 (6th Cir. 2013); *United States v. Marrero*, 651 F.3d 453 (6th Cir. 2011).

The *Pouncy* court explored what a habeas petitioner would have to show to succeed

on a "Hobson's choice" coercion theory in this context:

> [W]e have previously interpreted the basic teaching of *Iowa v. Tovar*, 541 U.S. 77 (2004), *Faretta*, and *Johnson v. Zerbst*, 304 U.S. 458 (1938)—that the voluntariness of a waiver is measured by reference to the surrounding circumstances—as clearly establishing the principle that "the choice between unprepared counsel and self-representation is no choice at all." *James*, 470 F.3d at 644 (quoting *Fowler v. Collins*, 253 F.3d 244, 249–50 (6th Cir. 2001)) (applying 28 U.S.C. § 2254(d)). But even if *Tovar*, *Faretta*, and *Johnson* "clearly establis[h]" the "Hobson's choice" principle that Pouncy invokes on appeal, Pouncy faces an uphill battle in showing that no proper application of those holdings could lead to the conclusion that Pouncy voluntarily waived his right to counsel. Not only does Pouncy, as a habeas petitioner, bear the ultimate burden of proving that his waiver of counsel was involuntary, *see Glass v. Pineda*, 635 F. App'x. 207, 214 (6th Cir. 2015); *Akins v. Easterling*, 648 F.3d 380, 395 (6th Cir. 2011), but also those habeas courts that have applied the principle that "a choice between proceeding with incompetent counsel or no counsel is . . . no choice at all" have emphasized that to succeed on such a claim, a petitioner must prove that appointed counsel was actually incompetent. *Wilks*, 627 F.2d at 36. Doing so is no easy task.

*Pouncy*, 846 F.3d at 161. *Pouncy*, therefore, stands for the proposition that a defendant can

establish that his decision to represent himself was involuntary where he shows that his counsel

was incompetent.

The Sixth Circuit identified another possible way to demonstrate coercion in *United States v. Marrero*, 651 F.3d 453 (6th Cir. 2011). In *Marrero*, the Sixth Circuit considered a "Hobson's choice" coercion claim in a slightly different context: the accused wanted to get rid of his counsel because counsel pressured him to plead guilty and refused to raise a jurisdictional defense or a sentencing argument based on a United States House of Representatives bill that had never become law. *Marrero*, 651 F.3d at 461. The court, concluding that the issues Marrero wanted counsel to raise lacked merit, denied the request to substitute counsel. Marrero opted to represent himself, but on appeal claimed that he faced a Hobson's choice of proceeding with an attorney he mistrusted or representing himself.

The *Marrero* court focused on whether substitution of counsel would have been appropriate, rather than on the competence of counsel, to resolve Marrero's claim:

> The Sixth Amendment secures to a defendant who faces incarceration the right to counsel at all "critical stages" of the criminal process. *United States v. Wade*, 388 U.S. 218, 224 (1967). This right must be knowingly and intelligently waived by a defendant electing to represent himself. *Faretta v. California*, 422 U.S. 806, 835 (1975). However, the right to counsel does not guarantee that a criminal defendant will be represented by a particular attorney. *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989). "An indigent defendant has no right to have a particular attorney represent him and therefore must demonstrate 'good cause' to warrant substitution of counsel." *United States v. Iles*, 906 F.2d 1122, 1130 (6th Cir. 1990). "[A] persistent, unreasonable demand for dismissal of counsel and appointment of new counsel is the functional equivalent of a valid waiver of counsel." *United States v. Green*, 388 F.3d 918, 921 (6th Cir. 2004) (internal quotation marks and alterations omitted); *see also King v. Bobby*, 433 F.3d 483, 492 (6th Cir. 2006) ("[B]y rejecting all of his options except self-representation, [the defendant] necessarily chose self-representation."). Therefore, "[r]esolution of whether [Marrero]'s decision to proceed pro se was voluntary hinges on whether [his] objections to [his] present counsel had such merit as to entitle [him] to have new counsel appointed." *United States v. Schmidt*, 105 F.3d 82, 89 (2d Cir. 1997).

*Marrero*, 651 F.3d at 464. So, under *Marrero*, even if counsel is not incompetent, a defendant may show coercion if his objections to counsel would have warranted a substitution of counsel.

The Supreme Court has recognized that a trial court has "wide latitude in balancing the right to counsel of choice against the needs of fairness, and against the demands of its calendar." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 152 (2006). To warrant a substitution of counsel during trial, the defendant "'must show good cause such as a conflict of interest, a complete breakdown in communication or an irreconcilable conflict with the attorney . . . .'" *United States v. Sullivan*, 431 F3d 976, 979-80 (6th Cir. 2005) (quoting *Wilson v. Mintzes*, 761 F.2d 275, 280 (6th Cir. 1985)). Thus, the Sixth Circuit, when reviewing a trial court's denial of a motion to substitute counsel, considers four factors:

> (1) the timeliness of the motion, (2) the adequacy of the court's inquiry into the matter, (3) the extent of the conflict between the attorney and client and whether it was so great that it resulted in a total lack of communication preventing an adequate defense, and (4) the balancing of these factors with the public's interest in the prompt and efficient administration of justice.

*Henness v. Bagley*, 644 F.3d 308, 321 (6th Cir. 2011) (quoting *United States v. Vasquez*, 560 F.3d 461, 466 (6th Cir. 2009)). Moreover, when "'the granting of the defendant's request would almost certainly necessitate a last-minute continuance, the trial judge's actions are entitled to extraordinary deference.'" *United States v. Whitfield*, 259 F. App'x 830, 834 (6th Cir. 2008).

Petitioner's case is more like Marrero's than Pouncy's, but his claim fails under the standards of either case. Petitioner has failed to demonstrate that his counsel was incompetent in any respect or that a substitution of counsel was appropriate. With regard to defense counsel's competence, the record reasonably supports the state appellate court's determination that counsel was prepared to proceed with trial. *Savickas*, 2017 WL 5616123, at *2 ("Defense counsel confirmed that she was 'prepared to go to trial' and represent defendant."). Counsel stated on the record:

> I have been in constant communication with Mr. Savickas. I've written him, although, um, he doesn't believe—he's shaking his head here in the courtroom. He doesn't believe that that's a communication, but it is. And so, Your Honor, I will just—I have you know, um, I have been in constant communication with him. He always could communicate with me through writing to me, and so there hasn't been any lack of communication on my part.

June 12, 2016 Trial Tr., pp. 17-18. The court asked counsel whether she was prepared to go to trial on Petitioner's behalf; counsel answered in the affirmative. *Id*. At that time, Petitioner offered no evidence and he presently offers no evidence to the contrary. Thus, under *Pouncy*, Petitioner has failed to demonstrate that his decision to represent himself was involuntary.

Petitioner's "Hobson's choice" argument fares no better when measured against the *Marrero* standard. With regard to timeliness, Petitioner's request for substitute counsel came on the morning of trial and, therefore, was late. *See, e.g., McGhee v. MacLaren*, No. 17-1708, 2018 WL 3120798, at *2 (6th Cir. Jan. 19, 2018) ("The trial court rejected McGhee's motion because he waited to file his motion until the first day of trial, making it untimely . . . ."); *Mullins v. McKee*, No. 17-1845, 2018 WL 510134, at *2 (6th Cir. Jan. 3, 2018) ("Because Mullins sought the

appointment of substitute counsel on the first day of trial . . . reasonable jurists could not disagree with the district court's resolution [denying] this claim."); *Nelson v. Jackson*, No. 16-2623, 2017 WL 5624278, at *3 (6th Cir. July 17, 2017) ("The request for substitute counsel was made on the first day of trial.  Reasonable jurists would not debate that it was therefore untimely."); *United States v. Jackson*, 662 F. App'x 416, 423 (6th Cir. 2016) (motion made the day of trial untimely, collecting cases).

The court fully explored the nature of the conflict between Petitioner and his counsel.  There was only one issue:  Petitioner wanted to pursue a claim of self-defense; counsel did not.  The precise nature of the conflict between the defendant and counsel is significant.

In *McCoy v. Louisiana*, 138 S. Ct. 1500 (2018), the Supreme Court explored the division of decision-making responsibility between client and counsel:

> To gain assistance, a defendant need not surrender control entirely to counsel.  For the Sixth Amendment, in "grant[ing] to the accused personally the right to make his defense," "speaks of the 'assistance' of counsel, and an assistant, however expert, is still an assistant." *Faretta*, 422 U.S. at 819–820; *see Gannett Co. v. DePasquale*, 443 U.S. 368, 382, n.10 (1979) (the Sixth Amendment "contemplat[es] a norm in which the accused, and not a lawyer, is master of his own defense").  Trial management is the lawyer's province: Counsel provides his or her assistance by making decisions such as "what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence." *Gonzalez v. United States*, 553 U.S. 242, 248 (2008) (internal quotation marks and citations omitted).  Some decisions, however, are reserved for the client—notably, whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal.  *See Jones v. Barnes*, 463 U.S. 745, 751 (1983).

*McCoy*, 138 S. Ct. at 1508.  The dissenting opinion of Justice Alito, joined by Justice Thomas and Justice Gorsuch, provided additional detail regarding the respective decisional responsibilities of client and counsel:

> Under current precedent, there are some decisions on which a criminal defendant has the final say.  For example, a defendant cannot be forced to enter a plea against his wishes.  *See Brookhart v. Janis*, 384 U.S. 1, 5–7 (1966).  Similarly, no matter what counsel thinks best, a defendant has the right to insist on a jury trial and to take the stand and testify in his own defense.  *See Harris v. New York*, 401 U.S. 222, 225 (1971).  And if, as in this case, a defendant and retained counsel do not see eye to eye, the client can always attempt to find

21

another attorney who will accede to his wishes. *See Gonzalez–Lopez*, 548 U.S. at 144. A defendant can also choose to dispense with counsel entirely and represent himself. *See Faretta v. California*, 422 U.S. 806, 819 (1975).

While these fundamental decisions must be made by a criminal defendant, most of the decisions that arise in criminal cases are the prerogative of counsel. (Our adversarial system would break down if defense counsel were required to obtain the client's approval for every important move made during the course of the case.) Among the decisions that counsel is free to make unilaterally are the following: choosing the basic line of defense, moving to suppress evidence, delivering an opening statement and deciding what to say in the opening, objecting to the admission of evidence, cross-examining witnesses, offering evidence and calling defense witnesses, and deciding what to say in summation. *See, e.g., New York v. Hill*, 528 U.S. 110, 114–115 (2000).

*McCoy*, 138 S. Ct. at 1516.[5]

     *McCoy* instructs that counsel decides what arguments to make and counsel decides the basic line of defense. Therefore, the decision to argue self-defense or to forego such an argument are trial strategy decisions for counsel. *Tinsley v. Million*, 399 F.3d 796, 808 (6th Cir. 2005); *Meeks v. Bergen*, 749 F.2d 322, 328 (6th Cir. 1984); *Parker v. Kentucky Dep't of Corr.*, No. 17-5398, 2018 WL 1773113, at *3-4 (6th Cir. Mar. 26, 2018); *Johnson v. Gidley*, No. 16-1373, 2016 WL 7131505, at *2 (6th Cir. Dec. 6, 2016); *Vinson v. McLemore*, 226 F. App'x 582, 585 (6th Cir. 2007); Disagreements over strategy do not suffice to establish good cause for a substitution of counsel. *See, e.g., United States v. Johnson*, 612 F. App'x 345, 352 (6th Cir. 2015); *United States v. Herrera*, 636 F. App'x 2d 250, 255 (6th Cir. 2016).

     Moreover, the conflict did not prevent Petitioner and his counsel from communicating. Petitioner consulted with counsel as he made the decision to represent himself and availed himself of counsel's assistance as "stand-by" counsel during the trial. The court of

---

[5] The majority and dissenting opinions in *McCoy* were consistent when it came to drawing the line between decisions that belonged to the client and decisions that were within the prerogative of counsel. The opinions only differed as to which side of the line the decision at issue in *McCoy*—the concession of guilt—fell. The dissenting opinion's more detailed description of the line is, therefore, of some persuasive value, even if it is not of precedential value.

appeals' determinations that (1) counsel and Petitioner did not suffer a destruction of communication and (2) their relationship did not break down, are reasonable on the record.

Finally, the state appellate court concluded that a substitution of counsel would have been detrimental to the public's interest:

> Finally, we conclude that substitution of counsel would have unreasonably disrupted the judicial process. The prosecutor noted that he had "reluctant witnesses that don't want to testify" with him that day. He opined that the witnesses' reluctance would be even worse if the trial was delayed until "months down the road."

*Savickas*, 2017 WL 5616123, at *6. The trial court anticipated that a substitution of counsel would cause a 2 to 3-month delay. July 12, 2016 Trial Tr., p. 15. The court reasonably concluded that such a delay would be detrimental to the victims and their families. *Id*. The prosecutor confirmed that such a delay would jeopardize obtaining testimony form reluctant witnesses who were already present for the trial. *Id*. The court of appeals' factual determinations are well-supported by the trial record. Petitioner offers no evidence to overcome the presumption of correctness that is accorded those determinations.

The court of appeals concluded that consideration of the relevant factors did not favor a continuance of the trial to permit a substitution of counsel. As set forth in the analysis above, that conclusion is neither contrary to, nor an unreasonable application of clearly established federal law. Accordingly, where counsel was not incompetent and substitution of counsel was not warranted, Petitioner's decision to represent himself was not coerced. The situation here, therefore, is similar to the situation in *Stokes*, 527 F. App'x at 358. In *Stokes*, Judge Daughtrey, in her concurring opinion, repeated with approval the government's "Hobson's choice" counterargument: "when 'the government is providing the horse and the "horse nearest the door" is perfectly competent, the trial court may require the defendant to accept "the horse nearest the

door" or go by foot.'" *Id.* at 370 n.1. That is what happened here--and Petitioner voluntarily chose to go by foot. He is not entitled to habeas relief.

## Conclusion

In light of the foregoing, the Court will summarily dismiss Petitioner's application pursuant to Rule 4 because it fails to raise a meritorious federal claim.

## Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This Court's dismissal of Petitioner's action under Rule 4 of the Rules Governing § 2254 Cases is a determination that the habeas action, on its face, lacks sufficient merit to warrant service. It would be highly unlikely for this Court to grant a certificate, thus indicating to the Sixth Circuit Court of Appeals that an issue merits review, when the Court has already determined that the action is so lacking in merit that service is not warranted. *See Love v. Butler*, 952 F.2d 10 (1st Cir. 1991) (it is "somewhat anomalous" for the court to summarily dismiss under Rule 4 and grant a certificate); *Hendricks v. Vasquez*, 908 F.2d 490 (9th Cir. 1990) (requiring reversal where court summarily dismissed under Rule 4 but granted certificate); *Dory v. Comm'r of Corr. of New York*, 865 F.2d 44, 46 (2d Cir. 1989) (it was "intrinsically contradictory" to grant a certificate when habeas action does not warrant service under Rule 4); *Williams v. Kullman*, 722 F.2d 1048, 1050 n.1 (2d Cir. 1983) (issuing certificate would be inconsistent with a summary dismissal).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is

warranted. *Id.* at 467. Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability.

The Court will enter a judgment and order consistent with this opinion.

Dated: __October 31, 2018__          /s/ Janet T. Neff_____
                                     Janet T. Neff
                                     United States District Judge